NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JUSTIN M., STEPHANIE R., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, T.H., K.H., J.H., J.M., *Appellees*.

No. 1 CA-JV 18-0120
FILED 10-9-2018

Appeal from the Superior Court in Maricopa County
No.   JD529149
The Honorable Karen L. O'Connor, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Kathryn E. Harris
*Counsel for Appellant Justin M.*

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant Stephanie R.*

Arizona Attorney General's Office, Tucson
By Cathleen E. Fuller
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

---

**C A M P B E L L**, Judge:

¶1 Stephanie R. ("Mother") appeals the superior court's order terminating her parental rights to her four children. Justin M. ("Father") appeals the superior court's order terminating his parental rights to J.M., the daughter he has in common with Mother. [1]

## BACKGROUND

¶2 From 2008 to 2015, Mother and Father lived in Tennessee with the children: T.H., born in 2007, K.H., born in 2008, J.H., born in 2010, and J.M., born in 2013. The family had an extensive history with the Tennessee Department of Children's Services ("Tennessee DCS") based on allegations ranging from physical abuse to "environmental neglect." In early 2015, Tennessee case workers recommended services for the parents, but they refused to participate. That August, the family moved from Tennessee to Arizona.

¶3 A week after moving, the family became homeless and Mother attempted suicide. Mother suffered from anxiety and bipolar disorder with depressive features. Because she could not meet the children's needs, Mother asked the Arizona Department of Child Safety (the "Department") to take custody of them. The Department did so and filed dependency petitions.

¶4 In November 2015, the court found the children dependent and set a case plan of family reunification. Over the next nine months the parents participated in multiple services designed to help reunify the family. Through her own provider, Mother also addressed her mental health. The parents obtained jobs and secured an apartment with the help of a housing subsidy provided by the Department. In early 2016, the parents completed psychological evaluations with Dr. James Thal. Dr. Thal opined

---

[1] The alleged fathers of the three other children are not parties to this appeal.

that the parents might be able to demonstrate minimally adequate parenting skills in the near future but noted that the children would remain "at risk for possible homelessness" if returned to the parents' care. Because the parents were complying with the case plan, however, the Department referred the family for family reunification services in August 2016, and the court returned the children to the parents' physical custody.

¶5        Two months later, before completing reunification services, the parents told the reunification team that they were moving to another apartment. Contrary to their claim, Mother and Father were evicted for failing to pay rent and moved into a motel. That same week, the parents told the case manager they were on their way to a team decision-making meeting with the Department, but they instead left for Tennessee with the children. Shortly afterward, the Department located the family in Texas, the court returned the children to Department custody in Arizona, and the parents completed their move to Tennessee.

¶6        In Tennessee, the parents obtained employment, but Mother did not obtain mental health services for several months. The parents lived with relatives before moving into a house owned by Mother's grandfather. The home needed a lot of work; initially, it had no running water or electricity. In February 2017, the Department initiated a placement assessment under the Interstate Compact on the Placement of Children to investigate the parents' Tennessee home. Two months later, police arrested the parents for assault, but eventually dropped the charges. The parents did not inform the Department about their encounter with law enforcement.

¶7        Around July, the parents set up utilities for the home, and Mother enrolled in mental health services. In August, although Tennessee case workers had found Mother's home to be minimally adequate for the children, Tennessee DCS denied the placement assessment because of the parents' assault arrest, the family's history with Tennessee DCS, and Mother's mental health issues.

¶8        The Arizona court changed the case plan to severance and adoption, and the next month, the Department moved to terminate the parents' parental rights under the fifteen-month out-of-home placement ground. Around this time, the parents reported that they were no longer in a relationship, and Father moved to Virginia.[2] The Department initiated a

_____

[2] Though across state lines, Father's Virginia residence was located close to Mother's Tennessee residence. For various reasons, including the proximity

placement assessment for Father's Virginia residence. Ultimately, Virginia Child Protective Services did not recommend placing the children with Father because he failed to maintain contact with the Virginia caseworker and stopped paying his rent.

¶9          The superior court held a contested severance hearing in March 2018 and took the matter under advisement. The court then issued a ruling terminating the parents' rights on the ground alleged.

## DISCUSSION

¶10          To terminate a parent's parental rights the juvenile court must find at least one statutory ground under Arizona Revised Statutes ("A.R.S.") § 8-533 by clear and convincing evidence, A.R.S. § 8-537(B), and by a preponderance of evidence that termination is in the child's best interests, *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). [3] We will not reverse the juvenile court's termination order "unless no reasonable evidence supports its factual findings." *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 16 (App. 2016). We view the evidence and reasonable inferences drawn from it in the light most favorable to sustaining the juvenile court's decision, and we will not reweigh the evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

## I.      Fifteen Months in an Out-of-Home Placement

¶11          Under A.R.S. § 8-533(B)(8)(c), the superior court may terminate parental rights if it finds that: (1) "the child has been in an out-of-home placement for a cumulative total period of fifteen months or longer"; (2) "the parent has been unable to remedy the circumstances" that caused the out-of-home placement; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Relevant circumstances are those existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children. *Jordan C.*, 223 Ariz. at 96, ¶ 31 n.14. The juvenile court must also find the Department has made diligent efforts to provide appropriate reunification services. A.R.S. § 8-533(B)(8). The fifteen-month ground does not focus on

---

of their homes, the Department case manager believed the parents remained in a relationship.

[3] We cite to the current version of all applicable statutes because no revisions material to this decision have occurred.

a parent's efforts to cure the circumstances, but rather his or her ultimate ability to do so. *See* A.R.S. § 8-533(B)(8)(a), (c).

¶12　　　　Mother and Father argue insufficient evidence supports two of the court's findings under the fifteen-month out-of-home placement ground: (1) that they were unable to remedy the circumstances causing the children to remain in an out-of-home placement; and (2) that there is a substantial likelihood that they would not be capable of exercising proper and effective parental care and control in the near future.

### A. Mother

¶13　　　　Mother argues the court's findings are unsupported by the evidence because she obtained housing and employment and engaged in mental health treatment before the severance hearing. The superior court considered this evidence but determined that other reasonable evidence in the record supported severance under the fifteen-month ground. We agree.

¶14　　　　The Department took custody of the children because the parents were unemployed and homeless and Mother was not addressing her mental illness. Although the parents participated in services in Arizona, they were unable to maintain stable housing even with the assistance of a Department subsidy. Indeed, while the parents awaited the subsidy distribution, they did not pay rent or save their money for future rent payments. Only two months after the children returned home, the subsidy expired and the parents paid nothing further toward their rent and faced eviction.

¶15　　　　Mother did not dispute this at the severance hearing but testified that she stopped paying rent because their landlord would not make needed repairs and because she "was moving anyway so it wasn't something [she] needed to worry about." Yet, she did not try any other avenue to obtain the needed repairs before withholding rent. Nor did the parents inform the Department of their situation or seek other housing resources before being evicted. Instead, they misled the family reunification team about obtaining another apartment and moved into a motel. Moreover, the parents knew that the dependency remained active during this time and that they could not remove the children from Arizona. Nevertheless, they told the case manager they were on their way to a child and family team meeting, but instead left the state with the children.

¶16　　　　Mother also knew that failing to address her mental health would prevent reunification, but she did not engage in mental health treatment until approximately nine months after moving to Tennessee.

Additionally, she knew that failing to obtain safe and stable housing would prevent reunification. Yet, despite being employed in Tennessee, Mother was unable to obtain her own housing until about March 2017. The home she chose required significant work. Several months later, the home was found to be "minimally adequate"; however, Tennessee still denied Mother's Interstate Compact on the Placement of Children for other safety concerns. Thus, reasonable evidence supports the court's finding that, despite receiving multiple services over two and a half years of Department involvement, Mother was unable to remedy the circumstances causing the children's out-of-home placement.

¶17        Likewise, reasonable evidence supports the court's finding that a substantial likelihood existed that Mother would not be capable of exercising proper and effective parental care and control in the near future. By the time of the severance hearing, Mother had a 10-year pattern of instability, echoing Dr. Thal's April 2016 opinion that the children would remain at risk for homelessness in her care. Accordingly, the case manager told the parents that they needed to demonstrate at least a year of safe and stable housing before the Department would recommend reunification. Yet, only six months before the severance hearing, Mother still had not demonstrated to Arizona or Tennessee officials that she could consistently provide a safe and stable living environment for the children or otherwise meet the children's daily needs. While Mother argues the court should have focused on the recent stability she achieved just before the severance hearing, the superior court was in the best position to weigh the evidence. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002) ("The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings."). On this record, reasonable evidence supports the superior court's findings.

### B.        Father

¶18        Similarly, the record contains reasonable evidence supporting the superior court's findings as to Father. Father similarly had an unstable housing history until October 2017. At that time, Father reported that he and Mother had separated; he then rented a home in Virginia for $50 per month. Although Father initially maintained this home, he stopped paying rent three months before the severance hearing. Moreover, he failed to keep in touch with the Virginia Child Protective Services representative.

¶19        Father argues the case manager's testimony regarding his assessment's pending placement denial in Virginia was based on hearsay.

At the hearing, the Department case manager testified that the Virginia caseworker "indicated" she planned to deny Father's assessment because she "had not had contact with [F]ather in a number of weeks. She also learned . . . through [the] housing authority for [F]ather that he had not paid his rent" in three months "and was in the middle of the eviction process." Father concedes that he did not object to this testimony at the hearing, but argues that "the juvenile court relied heavily on" this evidence in its severance determination.[4]

**¶20**       However, reasonable evidence outside of the statements in question supports the juvenile court's findings. The Department case manager testified that Father usually provided her with documentation showing his rental payments. Yet, he had not provided her any proof of those payments between January and March 2018. Given this evidence, the superior court could have reasonably found that Father stopped paying his rent in Virginia. *See Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 82-83, ¶ 19 (App. 2005) ("A trial court has broad discretion in admitting or excluding evidence, and we will not disturb its decision absent a clear abuse of its discretion and resulting prejudice."). Thus, like Mother, Father had over 10 years of instability and faced another possible eviction just before the severance hearing.

## II.    Best Interests

**¶21**       The parents also challenge the court's finding that severance of their parental rights was in the children's best interests. Severance is in the best interests of the child "if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S. v. Dep't of Child Safety*, 799 Ariz. Adv. Rep. 27, ¶ 13 (Sept. 14, 2018). "At the best-interests stage of the analysis, we can presume that the interests of the parents and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Id.* (citation omitted).

**¶22**       The superior court found severance would benefit the children in many ways, and reasonable evidence supports those findings. Although the children lived in many placements, each placement provided them with safe and stable housing and met their daily needs. Moreover, at the time of the severance hearing, the children were living together with

---

[4] Father also did not lodge a hearsay objection to Exhibit 20, the Department's March 2018 court report, which contains the same statements.

care providers who were meeting their needs and wanted to adopt them. The case manager testified that they were doing well there, but if that placement could not adopt them for any reason, the children were otherwise adoptable. *See Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010) (affirmative benefits include availability of adoptive placement, whether placement is meeting child's needs, and whether children are adoptable).

**¶23**        Citing this court's opinion *Alma S. v. Department of Child Safety*, Mother and Father argue that these findings are insufficient to support the court's best interests determination. 244 Ariz. 152 (App. 2017). The Arizona Supreme Court vacated this court's opinion in *Alma S.* and affirmed the superior court's finding that termination of mother's parental rights was in the children's best interests. *Alma S.*, 799 Ariz. Adv. Rep. at ¶ 21. The supreme court noted that factfinders must consider the totality of the circumstances existing at the time of severance to determine the best interests of the children and rejected "the proposition that adoptability alone can never support a best-interests finding." *Id.* at ¶ 14. The supreme court articulated the correct standard, stating, "[w]hen a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." *Id.* (citing *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016)). Here, the superior court determined the children were in a placement that wanted to adopt, and even if that placement could not adopt them, the children were otherwise adoptable. Based on the supreme court's recent holding in *Alma S.* these findings are sufficient to support the superior court's best interests determination.

## CONCLUSION

**¶24**        For the reasons stated, we affirm the superior court's termination order.

